[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part IV.A. of the Discussion, and the Disposition are certified for publication.
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 812 
 OPINION
 INTRODUCTION David McFearson was convicted of various crimes arising from two shootings in which he was involved. He was sentenced to a determinate prison term of 14 years four months, and a consecutive indeterminate prison term of 25 years to life, based primarily on his conviction for using a firearm to cause great bodily injury during an attempted murder. (Pen. Code, §§ 187, subd. (a), 664, 12022.53, subd. (d).)[1]
 McFearson attacks his convictions on numerous grounds. First, he claims he was convicted improperly of two counts because they were lesser included offenses of other crimes of which he was convicted. Second, he claims his conviction must be reversed because of prosecutorial misconduct. Third, he argues the trial court erred in failing to provide the jury with a Sanchez[2] instruction. Finally, he asserts the trial court made various errors at the sentencing hearing.
 We agree that the convictions on two counts must be vacated because they are lesser included offenses of other crimes of which McFearson was convicted, and that the trial court erred during sentencing. We will reverse the convictions on the two lesser included counts and will vacate the sentence and remand for resentencing. We reject the remainder of the claims of error.
 We publish only our discussion of whether the trial court improperly used the fact of his prior convictions to impose an aggravated sentence and to enhance his sentence pursuant to the terms of section 667.5, subdivision (b). As we will explain, based on Supreme Court precedent, we conclude the trial *Page 813 court erred because it used a fact that resulted in an enhancement of McFearson's sentence also to impose an aggravated sentence. (§ 1170, subd. (b).) In reaching this conclusion, we disagree with a prior decision from this court, People v. Hurley (1983) 144 Cal.App.3d 706,709-710 [192 Cal.Rptr. 805] (Hurley).
 FACTUAL AND PROCEDURAL SUMMARY* In February 2006, Shareco Ervin was talking on his phone when he drove into the parking lot of a local convenience store. He noticed McFearson and Renita Lynn Williams in the parking lot as he drove up. Ervin finished his phone call and began to exit the vehicle. When he looked up, he saw McFearson point a gun at him and begin shooting. Ervin ducked to avoid the bullets, but was struck twice in the arm. Ervin admitted knowing Williams's brother, but denied meeting either McFearson or Williams before the shooting.
 Daniel Marquez Ozuna was the cashier at the convenience store that night. Just before the shooting, he heard McFearson call out, "Hey, cuz." At the time, McFearson was walking towards the store. McFearson began shooting a gun, but Ozuna could not see at what McFearson was shooting. Ozuna ran behind the counter and lay on the ground until Ervin ran inside the store. Ervin was holding his bleeding arm.
 The events leading up to the shooting were described by Williams, McFearson's companion at the time. Williams met McFearson in November 2005. They became romantically involved shortly thereafter. They spent time together, both in Bakersfield, where Williams lived, and in Oakland, where McFearson lived.
 On December 24, 2005, McFearson and Williams's brother, Malachi Lilo Walton, got into an argument at the apartment Williams shared with her family. McFearson hit Malachi and then ran out of the house. Willams's other brother, Simeon Walton, followed McFearson outside and threw an ashtray at McFearson's van. McFearson pulled out a gun from inside the car and shot at Simeon. No one was injured by the bullets and the police were not called.
 Williams spoke with McFearson about two hours later. McFearson said he shot at Simeon because he heard the ashtray hit his van and thought Simeon was shooting at him. He also asked if Williams called the police.
 Williams's brother, Malachi, and mother, Regina Lynn Bermudas Walton, confirmed Williams's testimony about the incident.
 Williams claimed she continued to see McFearson because she was afraid that if she did not, McFearson would hurt her family. She saw him most weekends.
 In February 2006 McFearson came to Bakersfield to visit Williams. Williams told McFearson she would be at a local fast-food restaurant picking up dinner for her children. As she paid for her food in the drive-through lane, McFearson pulled into the drive-through lane in the wrong direction, effectively preventing Williams from leaving. McFearson got out of his car and began talking to Williams. An employee from the restaurant came out and asked McFearson to move his car. An argument ensued, but McFearson eventually moved his vehicle. McFearson and Williams drove away and met in another parking lot.
 McFearson got into Williams's vehicle and the two drove around the area. They ended up at a parking lot in a local park. Williams and McFearson went for a walk. There were two other vehicles in the parking lot when they returned to Williams's vehicle. One of the vehicles left. McFearson took out a gun and shot at the remaining vehicle for no apparent reason.
 The next day Williams called in sick to work because she was afraid that if she went to work McFearson might follow her and shoot her. McFearson called later that day and arranged to meet Williams. The two again drove around the area in Williams's vehicle. They drove to a convenience store and entered the parking lot. Another vehicle was in the parking lot with a man whom Williams did not know sitting inside. McFearson said he was going "to show these Bakersfield niggas how it's done," or words to that effect, and got out of Williams's car and began shooting at the other vehicle.
 Williams screamed and started backing up her vehicle. McFearson got back into the car and Williams drove away from the scene. Williams drove in excess of the speed limit, hoping an officer would pull her over. When the car ran out of gas, McFearson began pushing the car towards a gas station. McFearson gave Williams some money then ran off when a security guard began approaching the vehicle. Williams put gas in her car and drove away.
 McFearson called and asked her location. He became agitated when he could not find Williams, and he threatened to kill her mother and son. Williams called her mother and warned her. She then called the police and told them about the shooting and McFearson's threats to her family.
 Officer Michael Allred responded to Williams's apartment. He saw an individual matching McFearson's description walking in a parking lot near the apartment. The pedestrian ran away when Allred used his spotlight in an attempt to identify him. Allred and other officers chased and eventually arrested the pedestrian, who was indeed McFearson. The officers did not locate any weapons on McFearson when he was arrested. A firearm was located approximately 40 feet from where McFearson was arrested. The firearm was in a dirt field on the opposite side of a tall wall.
 When McFearson was searched during the booking process, three pills in a plastic baggie were found hidden in his sock. Testing established the pills were methalenedioxy methamphetamine, commonly known as ecstasy, and that each pill was a useable quantity.
 McFearson called Williams shortly after he was arrested. He told her not to say anything.
 A few days later Williams called Ervin. She obtained Ervin's girlfriend's phone number from someone, but she could not remember from whom. Williams told Ervin she did not know why McFearson shot him.
 Melissa Renee Harts divorced McFearson in 2001. Harts was close to McFearson's family, so her relationship with him continued after the divorce. In 2005, Harts purchased a gun for self-protection. She kept it stored in the trunk of her car. In December 2005, Harts noticed the gun was missing from the trunk of her car.
 She reported the theft of the gun to the police. The firearm the police recovered at the scene of McFearson's arrest was identified as the firearm purchased by Harts.
 Officer Richard Dossey, Jr., reviewed tapes of conversations between McFearson and Williams while McFearson was incarcerated. During one or more of those conversations, McFearson suggested that Williams would not have to testify if she could not be found by the police. He also instructed her to deny that she signed any statements, suggesting she testify that she signed a blank piece of paper and the police wrote the statement after it was signed.
 McFearson testified that Harts purchased the gun for him as a birthday present.[3] Harts purchased the gun because, as a felon, McFearson was not permitted to buy a gun. McFearson usually kept the gun with him.
 On Christmas Eve, McFearson drove to Bakersfield to visit Williams. During the visit, Malachi began calling him names. When McFearson tried to walk away, Malachi spit on him. McFearson hit Malachi in the face, knocking him down. McFearson ran to his vehicle. He saw Simeon running towards him with something in his hand while yelling threats. Several people from the house followed Simeon outside. Simeon threw the object and hit McFearson's vehicle. McFearson grabbed his gun from under the seat of the vehicle and fired two rounds in a safe direction, not intending to shoot anyone. He then got into his vehicle and left.
 McFearson and Williams smoked marijuana together. Williams supplied the marijuana. She told McFearson that she bought the marijuana from Ervin.
 McFearson admitted being in the park with Williams, but denied shooting at anyone. The next night he again met Williams. They drove around, eventually ending up at the convenience store.
 McFearson and Williams were talking in the car when Ervin pulled up in his vehicle. McFearson and Ervin stared at (mad dogged) each other. McFearson asked Williams if she knew the person at whom he was staring. Williams said she did, and that Ervin would "kill [her] at the drop of a dime." McFearson exited the vehicle to go into the store while still staring at Ervin. As he approached the store, it appeared to McFearson that Ervin grabbed a weapon and tried to open the door. McFearson pulled out his gun and shot at Ervin as he (McFearson) was running back to Williams's vehicle. McFearson claimed he was firing to pin Ervin down so he and Williams could escape.
 They drove until the vehicle ran out of gas. McFearson pushed the vehicle towards a gas station, but stopped in a restaurant parking lot when he became tired. Williams left to buy gas. After she left, a security guard approached the vehicle. McFearson panicked and ran away. He called Harts to come and pick him up.
 McFearson called Williams after dropping Harts at her house. McFearson and Williams tried to find each other but could not do so. Williams eventually told McFearson to meet her in the parking lot of her apartment building. McFearson parked his car in a convenience store parking lot and looked for a place to hide the gun. When he could not find a suitable place, he threw it over a wall into the dirt field in which the gun eventually was found. McFearson then walked to the apartment building parking lot, but Williams was not there. McFearson was walking back to the convenience store when he was spotted by the police and arrested. McFearson denied threatening to kill anyone in Williams's family.
 These events led to the filing of a 28-page indictment alleging 15 separate counts and numerous enhancements. To ease the reader's task, we will review the charges in the context of the jury verdict. The jury convicted McFearson of (1) the attempted murder of Ervin (§§ 187, subd. (a), 664) (count 1), (2) assaulting Ervin with a semiautomatic firearm (§ 245, subd. (b)) (count 2), (3) assaulting Ervin with a firearm (§ 245, subd. (a)(2)) (count 3), (4) possession of a controlled substance while armed with a loaded firearm (at the time of his arrest) (Health 
Saf. Code, § 11370.1) (count 6), (5) possession of a controlled substance (at the time of his arrest) (Health Saf. Code, § 11377, subd. (a)) (count 7), (6) possession of a firearm by a felon during the Ervin incident (§ 12021, subd. (a)(1) (count 9), (7) carrying a loaded firearm with a prior felony conviction during the Ervin incident (§ 12031, subd. (a)(2)(A)) (count 11), and (8) possession of a firearm by a felon during the Simeon Walton incident (§ 12021, subd. (a)(1)) (count 14).
 In addition, the jury found the following enhancements true: (1) intentional discharge of a firearm, causing great bodily injury (§ 12022.53, subd. (d)) (count 1), (2) personal use of a firearm (§ 12022.5, subd. (a)) (counts 1, 2, and 3), and (3) personal infliction of great bodily injury (§ 12022.7) (counts 1, 2, and 3).
 The jury acquitted McFearson of (1) kidnapping Williams (§ 207) (and all lesser offenses) (count 4), (2) making criminal threats to Williams (§ 422) (count 5), (3) possession of stolen property (Harts's gun) (§ 496, subd. (a)) (count 8), (4) carrying a stolen firearm that was loaded (§ 12031, subd. (a)(2)(B)) (count 10), (5) assaulting Simeon Walton with a semiautomatic firearm (§ 245, subd. (b)) (count 12), (6) assaulting Simeon Walton with a firearm (§ 245, subd. (a)(2)) (and all lesser offenses) (count 13), and (7) misdemeanor resisting arrest (§ 148, subd. (a)(1)) (count 15).
 McFearson waived his right to a jury trial on the allegation that he served three prior prison terms within the meaning of section 667.5, subdivision (b). The trial court found the allegations true.
 The trial court imposed an aggravated term of nine years for count 1 (attempted murder), enhanced by 25 years to life for the section 12022.53, subdivision (d) enhancement (personal use of a firearm causing great bodily injury), and enhanced by another three years for the three section 667.5, subdivision (b) enhancements (prior prison terms). In addition, the trial court imposed a consecutive one-year sentence on count 6 (possession of a controlled substance while armed), a consecutive term of eight months for count 9 (possession of a firearm by a felon (Ervin incident)), and a consecutive term of eight months for count 14 (possession of a firearm by a felon (Simeon Walton incident)), for a total determinate term of 14 years 4 months, plus an indeterminate term of 25 years to life. The sentences on the remaining counts and enhancements were imposed and stayed pursuant to section 654.
 DISCUSSION
I. Lesser Included Offenses*
 McFearson argues the convictions in counts 3 (§ 245, subd. (a)(2)) and 7 (Health Saf. Code, § 11377, subd. (a)) must be reversed because they are lesser included offenses to counts 2 (§ 245, subd. (b)) and 6 (Health Saf. Code, § 11370.1). The People concede the convictions must be reversed.
 "In California, a single act or course of conduct by a defendant can lead to convictions `of any number of the offenses charged.' [Citations.]" (People v. Montoya (2004) 33 Cal.4th 1031, 1034; see also § 954.) Section 654, however, "prohibits multiple punishment for the same `act or omission.' When section 954 permits multiple conviction, but section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. [Citations.]" (People v. Reed (2006) 38 Cal.4th 1224, 1227
(Reed).)
 "A judicially created exception to the general rule permitting multiple conviction `prohibits multiple convictions based on necessarily included offenses.' [Citation.] `[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (Reed, supra,38 Cal.4th at p. 1227.) An offense is necessarily included in another "if the statutory elements of the greater offense include all of the statutory elements of the lesser offense." (Id. at pp. 1227, 1229.) The two convictions identified by McFearson meet this test.
 Count 2 charged McFearson with assault with a semiautomatic firearm. (§ 245, subd. (b).) The elements for this offense are: (1) The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant acted willfully; (3) the defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (4) the defendant had the present ability to apply force with a semiautomatic firearm to a person. (See Judicial Council of Cal. Crim. Jury Instns. (2006-2007), CALCRIM No. 875.) Count 3 charged McFearson with assault with a firearm. The only difference in the elements for assault with a firearm is that the word "firearm" is substituted for the term "semiautomatic firearm." It is beyond dispute that a semiautomatic firearm is a subcategory of the more general classification of firearm. Therefore, one committing an assault with a semiautomatic firearm must necessarily commit an assault with a firearm. The conviction for assault with a firearm cannot stand.
 We reach the same result when considering the possession charges. Health and Safety Code section 11370.1, subdivision (a) criminalizes the possession of certain controlled substances while the defendant is "armed with a loaded, operable firearm." The jury found McFearson guilty of this crime in count 6. In count 7, the jury found McFearson guilty of violating Health and Safety Code section 11377, subdivision (a), which criminalizes possession of certain controlled substances.
 The elements that must be proven to establish a defendant possessed controlled substances while armed are: (1) The defendant possessed a controlled substance; (2) the defendant knew of its presence; (3) the defendant knew of the substance's nature or character as a controlled substance; (4) the identity of the controlled substance; (5) the controlled substance was in a usable amount; (6) while in possession of the controlled substance, the defendant also possessed a loaded, operable firearm; and (7) the defendant knew that he had the firearm available for immediate use. (CALCRIM No. 2303.) The elements to prove the crime of simple possession are identical to the elements of the possession while armed count, except the defendant is not required to possess a firearm (the last two elements of CALCRIM 2303). Therefore, a defendant who is convicted of possession of a controlled substance while armed necessarily commits the crime of simple possession if the same substance is involved in each count. The simple possession count also must be reversed.
II. Prosecutorial Misconduct*
 McFearson testified he shot at Ervin because he believed Ervin was going to shoot at him. During closing argument, the prosecutor argued the claim of self-defense was baseless. During his closing argument, McFearson's counsel suggested that McFearson thought Ervin was going to pull out a gun when he put his cell phone down while seated in the car. This argument brought the following rebuttal from the prosecutor:
 "One of the things you need to think about is the defendant says there was a gun in the victim's possession that night.
 "How many officers testified up on that witness stand? How many officers said: I located a gun at the scene of the Day Night Market?
 "There were no questions asked of those officers by defense: Did you locate a gun?
 "When asked by me: What items of evidence did you locate? The officers testified about finding casings, about finding bullets. Not a single officer located the gun.
 "So if there was a gun, where was that gun?
 "The cars get towed. The cars were inspected. Mr. Marquez testified. He wasn't asked by the defense if he hid a gun or did anything of that nature.
 "Where is this invisible gun?
 "There was never any gun. That's why no one ever testified about the victim, Mr. Ervin, having a gun.
 "So counsel, because there isn't any gun, would have you believe: Well, that's all right. What the defendant saw was not really a gun. But in the defendant's mind it was when he put away the cell phone. The defendant thought by putting away that cell phone — the defendant thought that was a gun, because they can't account for why there's no gun. So let's use the cell phone for that allegedly being the gun.
 "So the defendant would have you believe that he's gone up to this guy who he's just been told is a scary person, that Ms. Williams just told her boyfriend: That guy over there, he's really mean.
 "So the defendant decides: I'm just going to go up there with my gun. And he's looking at this guy, basically, confronting him, throwing some looks at him back and forth. And he gets his gun and he shoots at this guy. And all of this is done in his perceived self-defense theory when all the evidence is contrary to his story that he gave you on the witness stand."
 McFearson contends the prosecutor's rebuttal argument constituted misconduct because it misstated the law of self-defense and insinuated that McFearson and his counsel fabricated the defense.
 The People urge us to reject the argument as forfeited because McFearson failed to object at trial. "`As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (People v. Hill (1998)17 Cal.4th 800, 820.) The failure to object results in a forfeiture of the issue. (People v. Partida (2005) 37 Cal.4th 428, 433-436.)
 McFearson argues that no objection was necessary because his constitutional rights were violated or, if an objection was required, he received ineffective assistance of counsel.
 We conclude there was no prosecutorial misconduct, so counsel was not ineffective for failing to object.
 "The applicable federal and state standards regarding prosecutorial misconduct are well established. `"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct `so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.]
 Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves `"`the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.]" (People v.Samayoa (1997) 15 Cal.4th 795, 841.)
 "Regarding the scope of permissible prosecutorial argument, we recently noted `"`a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] `A prosecutor may "vigorously argue his case and is not limited to `Chesterfieldian politeness'" [citation], and he may "use appropriate epithets. . . ."'" [Citation.]' [Citation.]" (People v.Hill, supra, 17 Cal.4th at p. 819.)
 The comments to which McFearson objects fall within the scope of permissible argument. The prosecutor was attacking McFearson's claim of self-defense. The most obvious defect in the claim was that Ervin was not armed. The prosecutor was attempting to focus the jury on this defect with her references to the lack of evidence that Ervin was armed.
 The remainder of the quoted portion of the argument relates to the prosecutor attacking McFearson's credibility. Since McFearson testified at trial, and was the only witness to support his claim of self-defense, his credibility was a central issue at trial. The prosecutor was entitled to address the issue during her rebuttal argument.
 We do not read the prosecutor's argument, as McFearson asks us to do, as accusing McFearson's attorney of fabricating evidence. Indeed, there is nothing in this argument directed at counsel. Instead, the prosecutor paraphrased counsel's argument and then urged the jury to reject it as unbelievable.
 Nor do we read the prosecutor's argument as informing the jury that McFearson's self-defense argument could be accepted by the jury only if Ervin were armed. The prosecutor did not make any reference to the law requiring the victim be armed before McFearson could defend himself. Instead, the prosecutor focused on the assertion that McFearson mistook a cell phone for a firearm, or the act of putting down a cell phone for the act of reaching for a firearm. Again, the prosecutor urged the jury to reject the argument as unbelievable.
 McFearson's assertion of prosecutorial misconduct is based on a reading of the record with which we cannot agree. There was no misconduct.
 III. Failure to Instruct With a Sanchez Instruction*
 McFearson failed to request the trial court instruct the jury that his self-defense claim need only raise a reasonable doubt about his guilt pursuant to Sanchez, supra, 30 Cal.2d at pp. 570-571. According to McFearson, the jury should have been instructed that "It is not necessary for defendant to establish self-defense by evidence sufficient to satisfy the jury that the self-defense was true, but if the evidence is sufficient to raise a reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal."
 McFearson is undeterred by his failure to request the instruction. He asserts that either the trial court was required to instruct the jury with the Sanchez instruction sua sponte or he received ineffective assistance of counsel because of the failure to request the instruction.
 McFearson's first argument is premised on the assertion that a Sanchez
instruction is an instruction affecting the burden of proof, which the trial court is required to give sua sponte. To support his argument, McFearson cites to Evidence Code section 502, People v. Simon (1995)9 Cal.4th 493 (Simon), and People v. Mower (2002) 28 Cal.4th 457 (Mower).
 Evidence Code section 502 states: "The court on all proper occasions shall instruct the jury as to which party bears the burden of proof on each issue and as to whether that burden requires that a party raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt."
 Mower required the Supreme Court to interpret the newly enacted Compassionate Use Act of 1996 (Prop. 215, as approved by voters, Gen. Elec. (Nov. 5, 1996) (the Act). The Act added section 11362.5 to the Health and Safety Code. Subdivision (d) of section 11362.5 provides, in relevant part, that a patient who has the approval of his or her physician may not be prosecuted for the possession or cultivation of marijuana. Mower was prosecuted for cultivation of marijuana. He claimed his actions were immune pursuant to the terms of the Act.
 The Supreme Court first determined that Health and Safety Code section 11362.5, subdivision (d) provided a criminal defendant with limited immunity because "within its scope, section 11362.5(d) renders possession and cultivation of marijuana noncriminal — that is to say, it renders possession and cultivation of the marijuana noncriminal for a qualified patient or primary caregiver." (Mower, supra, 28 Cal.4th at p. 471.) The Supreme Court concluded the Act provided a potential defense at trial for a defendant charged with possession or cultivation of marijuana. (Mower, at pp. 474-475.)
 The Supreme Court also addressed the issues of the burden of proof and jury instructions for a defense based on the Act. After concluding the defendant bore the burden of proof on the defense (Mower, supra,28 Cal.4th at p. 477), the court proceeded to the question of jury instruction. We quote at length the discussion on this issue because it provides the basis for McFearson's argument.
 "We begin with Evidence Code section 501. That provision states: `Insofar as any statute, except [Evidence Code] Section 522, assigns the burden of proof in a criminal action, such statute is subject to Penal Code section 1096.' [Citation.] Penal Code section 1096 requires the People to prove the facts establishing a defendant's guilt beyond a reasonable doubt. In contrast, Evidence Code section 522 requires a defendant to prove the facts underlying a defense of insanity by a preponderance of the evidence.
 "The comment to Evidence Code section 501 by the California Law Revision Commission, which proposed that provision, states in pertinent part:
 `[Evidence Code] Section 501 is intended to make it clear that the statutory allocations of the burden of proof . . . are subject to Penal Code Section 1096, which requires that a criminal defendant be proved guilty beyond a reasonable doubt, i.e., that the statutory allocations do not (except on the issue of insanity) require the defendant to persuade the trier of fact of his innocence. Under Evidence Code Section 522, as under existing law, the defendant must prove his insanity by a preponderance of the evidence. [Citation.] However, where a statute allocates the burden of proof to the defendant on any other issue relating to the defendant's guilt, the defendant's burden, as under existing law, is merely to raise a reasonable doubt as to his guilt. [Citation.] [Evidence Code] Section 501 also makes it clear that, when a statute assigns the burden of proof to the prosecution in a criminal action, the prosecution must discharge that burden by proof beyond a reasonable doubt.' [Citation.]
 "Thus, Evidence Code section 501 provides that, when a statute allocates the burden of proof to a defendant on any fact relating to his or her guilt, the defendant is required merely to raise a reasonable doubt as to that fact.
 "With respect to many defenses, as `ha[s] been and [is] extremely common in the penal law' [citation], a defendant has been required merely to raise a reasonable doubt as to the underlying facts. Such defenses relate to the defendant's guilt or innocence. Perhaps most pertinent here are the defense of possession of a dangerous or restricted drug with a physician's prescription, against a charge of unlawful possession of such a drug [citation]; the defense of lawful acquisition of a hypodermic needle or syringe, against a charge of unlawful possession of such an item [citation]; and the defense of prescribing narcotics to an addict under lawful conditions, against a charge of unlawfully prescribing such substances to such a person [citation]. Such defenses relate to the defendant's guilt or innocence because they relate to an element of the crime in question. Thus, the defense of possession of a dangerous or restricted drug with a physician's prescription negates the element of unlawful possession of such a drug; the defense of lawful acquisition of a hypodermic needle or syringe negates the element of unlawful possession of such an item; and the defense of prescribing narcotics to an addict under lawful conditions negates the element of unlawfully
prescribing such substances to such a person.
 "When a statute allocates the burden of proof to a defendant as to a fact collateral to his or her guilt, however, the defendant may be required to prove that fact by a preponderance of the evidence. [Citations.]
 "With respect to only a handful of defenses has the defendant been required to prove the underlying facts by a preponderance of the evidence. Those are defenses that are collateral to the defendant's guilt or innocence. The most prominent is the defense of entrapment. [Citation.] `[T]he defense of entrapment . . . is not based on the defendant's innocence. The courts have created the defense as a control on illegal police conduct "out of regard for [the court's] own dignity, and in the exercise of its power and the performance of its duty to formulate and apply proper standards for judicial enforcement of the criminal law."' [Citation.] Such defenses are collateral to the defendant's guilt or innocence because they are collateral to any element of the crime in question. Thus, the defense of entrapment does not bear on the defendant's conduct in any way, but solely on the conduct of the police." (Mower, supra, 28 Cal.4th at pp. 478-481, fns. omitted.)
 McFearson argues that his claim of self-defense goes to the elements of the crime, and thus is required to be proven only to the extent the defense raises a reasonable doubt about his guilt. The People properly concede this point, but instead argue the trial court was not required to give the instruction sua sponte. According to the People, McFearson's failure to request the instruction has resulted in a forfeiture of the right to have the jury instructed with a Sanchez instruction. McFearson relies on Simon to support his argument that the trial court had a sua sponte duty to instruct the jury with a Sanchez instruction.
 In Simon, the defendant was charged with selling unqualified securities. (Corp. Code, § 25110.) Simon argued the securities were exempt from the statutes pursuant to Corporations Code section 25102, subdivision (f), which provides, in part, that sales of certain interests in limited partnership need not comply with Corporations Code section 25110. The defendant is assigned the burden of proving the exemption by Corporations Code section 25163. The trial court simply instructed the jury that "`The burden of proving an exemption is upon the defendant.'" (Simon, supra, 9 Cal.4th at p. 501.)
 The Supreme Court held the instruction was erroneous because it failed to inform the jury the defendant was required only to raise a reasonable doubt that the security was exempt. "Because an exemption defense is not collateral to the defendant's guilt of a charge of selling unqualified securities, however, a defendant's burden is only to raise a reasonable doubt that the defendant sold nonexempt securities. [Citations.]" (Simon, supra, 9 Cal.4th at p. 501.) The Supreme Court held the error required reversal of the judgment because of the prejudicial impact of the error. (Id. at p. 506.)
 The Supreme Court did not directly state in Simon that the trial court is required to instruct sua sponte regarding the defense provided in Corporations Code section 25102, subdivision (f), but that requirement may be inferred. There is no suggestion in Simon that the defendant requested the trial court instruct the jury regarding the burden of proof. The trial court simply told the jury that the defendant bore the burden of proof to establish the Corporations Code section 25102, subdivision (f) exemption. The Supreme Court relied on Evidence Code section 502 when concluding that the trial court was required to instruct on the defendant's burden of proof on the exemption defense and citedPeople v. Figueroa (1986) 41 Cal.3d 714, 722. (Simon, supra,9 Cal.4th at p. 501.) Figueroa used the same analysis as Mower to arrive at the same conclusion. The Supreme Court's conclusion that the trial court erroneously instructed the jury on the burden of proof when the defendant apparently did not request the appropriate instruction strongly suggests the trial court had a sua sponte duty to instruct the jury properly on the issue.
 The People rely on several decisions that state a Sanchez instruction need be given only upon request. In Sanchez, the defendant requested the jury be instructed as follows: "In a trial for murder it is not necessary for the defendant to establish self-defense by evidence sufficient to satisfy the jury that the self-defense was true, but if the evidence is sufficient to raise a reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal." (Sanchez, supra,30 Cal.2d at p. 571.) The Supreme Court held the instruction was a correct statement of the law and the instruction should be given "where the evidence warrants submitting the issue to the jury." (Ibid.) There was no discussion on whether the instruction should be given sua sponte, or whether the instruction must be requested by the defendant.
 In People v. Adrian (1982) 135 Cal.App.3d 335, however, the appellate court stated that "such an instruction must be given upon request
whenever the claim of self-defense has been properly tendered and the evidence warrants submitting the issue to the jury." (Id. at p. 337, italics added.) The issue in Adrian was whether the Sanchez formulation applied when the defendant was charged with assault, not murder, and the defendant claimed he acted in self-defense. The trial court refused Adrian's request to give a Sanchez instruction. The issue of whether the trial court had a sua sponte obligation to instruct with a Sanchez
instruction was not raised.
 Another case in this same category is People v. Ayers (2005)125 Cal.App.4th 988, in which this court stated that a Sanchez
instruction must be given only upon request. The issue, however, was not raised by the parties on appeal. Instead, the defendant requested the trial court modify CALJIC No. 9.35 (spousal battery) to state that the use of force must not only be willful, but also unlawful. We rejected the claim that the failure to modify CALJIC No. 9.35 was error. (Ayers, at p. 997.) We then "mention that defendant would have been entitled, upon request, to" a Sanchez instruction. (Ayers, at p. 997.) Our opinion goes on to note that "Existing authority does not hold that there exists a sua sponte obligation to give a Sanchez instruction whenever a self-defense claim is raised and we decline to impose such a burden on the trial courts." (Id. at p. 998.)
 In People v. Sandoval (1970) 9 Cal.App.3d 885, however, the issue was specifically addressed. Sandoval did not request a Sanchez instruction, but argued the trial court had a sua sponte obligation to give the instruction. The appellate court recognized that the trial court was required to instruct sua sponte on the principles of law closely connected to the facts of the case, including the laws "establishing and limiting the justifiable homicide defense," but concluded that theSanchez instruction is "a specific point, actually a pinpointing or amplification of two general principles — the rule of reasonable doubt and the defense of justification," and need be given only upon request. (Sandoval, at p. 888.)
 We need not decide whether Sandoval and its progeny will stand up to analysis after Mower and Simon because, even if there was error, reversal is not required. The jury was instructed with CALCRIM No. 505.[4] The instruction informed the jury on the elements of a justification defense and, as relevant to the issue before us, also informed the jury that "The People have the burden of proving beyond a reasonable doubt that the attempted killing was not justified. If the People have not met this burden, you must find the defendant not guilty of attempted murder or attempted voluntary manslaughter." This instruction adequately conveyed to the jury that it was the People's burden to prove beyond a reasonable doubt that McFearson did not act with justification when he shot Ervin. In other words, the instruction informed the jury that if McFearson's claims of self-defense resulted in reasonable doubt about whether the shooting was unlawful, then it must find McFearson not guilty. This is the same concept contained in a Sanchez instruction. It is also clear that the jury understood the instructions because they found McFearson not guilty of the assault with a firearm in the incident involving Williams's brother. The jury apparently concluded that McFearson acted in self-defense in that incident.
 The concepts contained in CALCRIM No. 505 and the resulting lack of prejudice also compel the conclusion that McFearson's counsel was effective. A defendant must prove both that his attorney was deficient because he or she acted below an objective standard of reasonableness under prevailing professional norms, and that had his or her attorney acted differently, it is reasonably probable he or she would have received a better result. (People v. Dennis (1998) 17 Cal.4th 468,540-541.) Since the reason for requesting a Sanchez instruction was adequately covered in CALCRIM No. 505, it was not unreasonable for defense counsel to fail to request a Sanchez instruction. Moreover, since McFearson did not suffer any prejudice as a result of the failure to instruct the jury with a Sanchez instruction, it is not reasonably probable he would have received a better outcome if the instruction had been requested. McFearson's contention fails.
IV. Sentencing Issues
 A. Improper use of prior convictions
 Section 1170 explains how a trial court should determine the appropriate sentence from the applicable sentencing triad under the determinate sentencing law. Subdivision (b) of section 1170 instructs on the use of mitigating and aggravating circumstances. In pertinent part, this subdivision states: "[T]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (Ibid.) California Rules of Court, rule 4.420(c) is in agreement: "To comply with section 1170(b), a fact charged and found as an enhancement may be used as a reason for imposing the upper term only if the court has discretion to strike the punishment for the enhancement and does so."
 McFearson contends these two provisions were violated when the trial court used his three prior convictions to impose an aggravated sentence and also used the same convictions to increase his sentence by three years pursuant to section 667.5, subdivision (b). This statute provides that when a defendant is convicted of a felony, the trial court shall impose a consecutive one-year term for each separate prison term served for any prior felony.
 The People recognize these statutes and this rule but argue, in essence, the fact used by the trial court in sentencing McFearson to an aggravated term was different from the fact used to increase his sentence. Specifically, the *Page 814 People contend the trial court used the fact of his prior conviction to impose the aggravated sentence, and the fact that he served a priorprison term to enhance his sentence. According to the People, this distinction removes this case from the dual use prohibition found in section 1170, subdivision (b). The People find support for their position in Hurley, supra, 144 Cal.App.3d at pages 709-710, which drew the same distinction between a prior conviction and a prior prison term.
 Two Supreme Court cases decided after Hurley, however, have cast doubt on this distinction. In People v. Prather (1990) 50 Cal.3d 428 [267 Cal.Rptr. 605, 787 P.2d 1012] (Prather), Prather pled guilty to one count of burglary (§ 459) and two counts of being a felon in possession of a firearm (§ 12021). He also admitted that he served a prior prison term pursuant to section 667.5, subdivision (b), and that he possessed a firearm while released from custody pursuant to section 12022.1, both one-year enhancements. (Prather, at p. 431.) At the time, section 1170.1, subdivision (g) prohibited a total sentence that was more than twice the base term.[5] (Prather, at pp. 431-432.) The base term imposed on Prather was two years, and the total term for all three counts and enhancements was six years four months. (Id. at p. 431.)
 The Court of Appeal concluded that the portion of the sentence that exceeded four years must be stayed pursuant to section 1170.1, subdivision (g). (Prather, supra, 50 Cal.3d at p. 432.) The People appealed, arguing that the section 667.5, subdivision (b) enhancement should not have been stricken.
 The Supreme Court determined it was required to resolve the conflict between section 1170.1, subdivision (g) and article I, section 28, subdivision (f) of the state Constitution, which provides, in part, "`Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall be used without limitation for purposes of enhancement of sentence in any criminal proceeding.'" (Prather, supra,50 Cal.3d at p. 432.)
 The Supreme Court concluded that the clear language of article I, section 28, subdivision (f) of the Constitution precluded the application of section 1170.1, subdivision (g) to the section 667.5, subdivision (b) enhancement. (Prather, supra, 50 Cal.3d at p. 437.) In reaching its conclusion, the Supreme Court rejected Prather's argument that article I, section 28, subdivision (f) did not apply because section 667.5, subdivision (b) enhanced a defendant's sentence because he or she served a prior prison term, not because of a prior felony conviction, which is the same argument asserted by the People in this case. *Page 815 
 "We find this interpretation of article I, section 28, subdivision (f) [of the Constitution] untenable. As we observed in Amador Valley [JointUnion High Sch. Dist. v. State Bd. of Equalization (1978)] 22 Cal.3d 208,244-245 [149 Cal.Rptr. 239, 583 P.2d 1281], a constitutional provision is `necessarily couched in general terms or language, [and thus should] not be interpreted according to narrow or supertechnical principles, but liberally and on broad general lines, so that it may accomplish in full measure the objects of its establishment and so carry out the great principles of government.' [Citation.] [In People v. Rodrigues (1998)205 Cal.App.3d 1487 [253 Cal.Rptr. 306], the court's] hypertechnical reading of Proposition 8 conflicts with this basic principle and ignores the underlying purposes of both that provision and section 667.5(b), namely, to provide increased terms of imprisonment for recidivist felony offenders. [Citations.]
 "Section 667.5(b) provides that `where the new offense is any felony for which a prison sentence is imposed, in addition and consecutive to any other prison terms therefor, the court shall impose a one-year term for each prior separate prison term served for any felony.' (Italics added.) We think it clear that section 667.5(b) is aimed primarily at the underlying felony conviction, and only secondarily, and as an indicium of the felony's seriousness, at the prior prison term. That is, we believe section 667.5(b), fairly read, merely provides a special sentence enhancement for that particular subset of `prior felony convictions' that were deemed serious enough by earlier sentencing courts to warrant actual imprisonment. [Citations.] Accordingly, we hold that the broad mandate of article I, section 28, subdivision (f) [of the Constitution], concerning the use of any `prior felony conviction[s]' for enhancement purposes, necessarily includes the lesser category of enhancements based on prior felony convictions for which imprisonment was imposed." (Prather, supra,50 Cal.3d at pp. 439-440.)
 While the factual context in Prather is different from that presented in this case, any suggestion that we should reach a different conclusion is dispelled by People v. Jones (1993) 5 Cal.4th 1142 [22 Cal.Rptr.2d 753,857 P.2d 1163]. Jones was convicted of three counts of forcible sodomy and one count of forcible penetration. (Id. at p. 1145.) Jones had several prior convictions, including one for an aggravated form of kidnapping (§ 209). The trial court enhanced Jones's sentence by one year pursuant to section 667.5, subdivision (b) for the prison term served as a result of the kidnapping conviction, and by five years pursuant to section 667, subdivision (a) because *Page 816 the same kidnapping conviction was a serious felony. (Jones, at pp. 1145-1146.)
 The issues before the Supreme Court were whether the conviction could be used to enhance Jones's sentence by five years and whether the prison term for that conviction could be used to enhance Jones's sentence by an additional year. The appellate court concluded the trial court did not err, relying on the same conviction/prison term distinction that is urged in this case. (People v. Jones, supra, 5 Cal.4th at pp. 1147-1148.) The Supreme Court disagreed, applying the same analysis as in Prather. "The Court of Appeal's statement is unpersuasive, however, because its premise — that sections 667 and 667.5 identify and punish differently situated individuals — runs afoul of Prather." (Jones, at p. 1148.)
 The situation presented in this case is indistinguishable from Jones.Prather and Jones establish that a section 667.5, subdivision (b) enhancement is based on the fact of a prior conviction, not a prior prison term. The trial court erred when it used McFearson's prior conviction to impose an aggravated sentence and then used the prison term served as a result of that conviction to enhance his sentence by one year pursuant to section 667.5, subdivision (b). (§ 1170, subd. (b).)
 McFearson urges us to strike the additional three years imposed pursuant to section 667.5, subdivision (b). The People, while not conceding the error, urge that if there was error, it was harmless. We conclude the correct result is to remand the matter to the trial court for resentencing. We reach this conclusion because we cannot say the trial court would have imposed an aggravated sentence if it did not consider the three prior convictions. Nor can we say it would have struck the three enhancements if it realized it could not use them for both purposes. We also recognize the potential implications of Cunningham v.California (2007) 549 U.S. ___ [166 L.Ed.2d 856, 127 S.Ct. 856] andPeople v. Black (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] on the decision to impose an aggravated sentence. The trial court should determine the appropriate sentence in the first instance after taking all of these factors into consideration.
 B. Improper imposition of enhancements*
 In count 1, the trial court enhanced McFearson's sentence pursuant to the terms of section 12022.53. The trial court also imposed, and stayed pursuant to section 654, enhancements pursuant to sections 12022.5 and 12022.7. McFearson argues the stayed enhancements must be stricken.
 Section 12022.53 enhances a defendant's sentence when he or she commits specific enumerated crimes while using a firearm. One of the enumerated crimes is attempted murder, the crime of which McFearson was convicted. (Id., subd. (a)(1), (18).) A defendant who personally and intentionally discharges a firearm and proximately causes great bodily injury or death while attempting to murder someone will have his or her sentence increased "by an additional and consecutive term of imprisonment . . . for 25 years to life." (Id., subd. (d).) Section 12022.5 increases a defendant's sentence by 10 years whenever he personally uses a firearm "in the commission of a felony or attempted felony. . . ." (Id., subd. (a).) Section 12022.7 increases a defendant's sentence by three years whenever the defendant "personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony. . . ." (Id., subd. (a).)
 To summarize, in this case section 12022.53 increased McFearson's sentence for personally using a firearm and causing great bodily injury; section 12022.5 increased his sentence for personally using a firearm; and section 12022.7 increased his sentence for causing great bodily injury. McFearson's personally using a firearm and causing great bodily injury were each used twice to enhance his sentence. McFearson claims this was error, even though the enhancements under sections 12022.5 and 12022.7 were stayed pursuant to section 654.
 McFearson points out that this result is prohibited in section 12022.53, subdivision (f), which states, in pertinent part, that "An enhancement involving a firearm specified in Section . . . 12022.5 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this section. An enhancement for great bodily injury as defined in section 12022.7 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)." According to the plain language of section 12022.53, therefore, the sections 12022.5 and 12022.7 enhancements must be stricken. (People v.Bracamonte (2003) 106 Cal.App.4th 704, 712-714.)
 The People rely on California Rules of Court, rule 4.447 to support their argument that the trial court did not err. This rule states that an enhancement that is prohibited by law or exceeds limitations on imposition of multiple enhancements must be imposed then stayed.[6]
 We have reviewed the numerous cases cited by the People. The only case that directly addressed the issue presented here is Bracamonte, which concludes that a section 12022.5 enhancement cannot be imposed when a section 12022.53, subdivision (d) enhancement is imposed. (People v.Bracamonte, supra, 106 Cal.App.4th at pp. 712-714.)
 The case on which the People place primary reliance is People v. Lopez
(2004) 119 Cal.App.4th 355. Lopez was found guilty of two counts of lewd and lascivious conduct and admitted there were multiple victims. The multiple victim findings exposed defendant to both the one strike law (§ 667.61) and the habitual sexual offender law (§ 667.71). The trial court sentenced Lopez under the habitual sexual offender law, and then imposed and stayed the sentence under the one strike law. Lopez urged the appellate court to find error and strike the special finding under the one strike law. The appellate court refused, finding that California Rules of Court, rule 4.447 required that result, and the result would make it easier in the future if for some reason, years down the road, the defendant's sentence was reversed in a habeas corpus proceeding requiring the defendant to be resentenced. (Lopez, at pp. 364-366.)
 The situation here differs from Lopez. The Lopez court was not faced with a statutory command that if a section 12022.53, subdivision (d) enhancement was imposed, the trial court could not impose a section 12022.5 or 12022.7 enhancement. We conclude the language of the statute requires the enhancements imposed pursuant to sections 12022.5 and 12022.7 be stricken.
 We do not publish our conclusion because this issue is pending before the California Supreme Court in People v. Gonzalez, review granted March 14, 2007, S149898. *Page 817 
 DISPOSITION The convictions for assault with a firearm (§ 245, subd. (a)(2)) (count 3) and possession of a controlled substance (Health Saf. Code, § 11377, subd. (a)) (count 7) are reversed. The convictions on the remaining counts are affirmed. The sentence is vacated and the matter is remanded for resentencing.
 Gomes, J., and Dawson, J., concurred.
[1]All further statutory references are to the Penal Code unless otherwise stated.
[2] People v. Sanchez (1947) 30 Cal.2d 560 [184 P.2d 673].
[3]McFearson claimed Harts made an initial down payment on the gun, and he paid the balance of the purchase price.
* See footnote, ante, page 810.
[4]The instruction, as read to the jury, reads in full: "The defendant is not guilty of attempted murder or attempted voluntary manslaughter if he was justified in attempting to kill someone in self-defense. [¶] The defendant acted in lawful self-defense if: One, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and, three, the defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. [¶] The defendant must have believed that he was in imminent danger of great bodily injury to himself. [¶] The defendant's belief must have been reasonable. And he must have acted only because of that belief. [¶] The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the attempted killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant, and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The defendant's beliefs that he was threatened may be reasonable even if he relied on information that was not true; however, the defendant must actually and reasonably have believed that the information was true. [¶] If you find that Shareco Ervin threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. If you find that the defendant knew that Shareco Ervin had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable. [¶] Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking self-defense measures against that person. [¶] If you find that the defendant received a threat from someone else that he reasonably associated with Shareco Ervin, you may consider that threat in deciding whether the defendant was justified in acting in self-defense. [¶] A defendant is not required to retreat. He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so, even if the safety could have been achieved by retreating. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that's greater than minor or moderate harm. [¶] The People have the burden of proving beyond a reasonable doubt that the attempted killing was not justified. If the People have not met this burden, you must find the defendant not guilty of attempted murder or attempted voluntary manslaughter."
[5]A 1997 amendment to section 1170.1 eliminated this restriction. (Stats. 1997, ch. 750, § 3.)
* See footnote, ante, page 810.
[6]California Rules of Court, rule 4.447, reads in full: "No finding of an enhancement may be stricken or dismissed because imposition of the term either is prohibited by law or exceeds limitations on the imposition of multiple enhancements. The sentencing judge must impose sentence for the aggregate term of imprisonment computed without reference to those prohibitions and limitations, and must thereupon stay execution of so much of the term as is prohibited or exceeds the applicable limit. The stay will become permanent on the defendant's service of the portion of the sentence not stayed." *Page 818